## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CAPE COD CHARTER BOAT ASS'N, et al.,**<br><br>Plaintiffs<br><br>v.<br><br>**DOUGLAS J. BURGUM, et al.,**<br><br>Defendants. | Case No. 1:25-cv-1457 (TNM) |

## <u>MEMORANDUM OPINION</u>

"Had our founding fathers chosen a fish rather than a bird as our national emblem, it would have had to have been the striped bass." George Reiger, *The Striped Bass Chronicles: The Saga of America's Great Game Fish* 1 (1997). Officially known as the *Morone saxatilis*, this silvery-white fish earns its colloquial name from the charcoal stripes running down its body. Dick Russell, *Striper Wars: An American Fish Story* 8, 14 (2005).

Long before the fish earned the name "striped bass," the Narragansett Indians called it *missuckeke-kequock*—"much fish" or "great fish." Russell, *Striper Wars* at 13. Colonists agreed the fish lived up to that name. "I myself at the turning of the tyde have seen such multitudes," Captain John Smith wrote, "that it seemed to me that one mighte go over their backs drisho'd [dry-shoed]." *Id.* In 1623, stripers caught with a single net kept Plymouth settlers fed for the entire summer. *Id.* at 14. After the Civil War, the nascent recreational fishing industry looked to the fish as a prized catch. *Id.* at 15. Through the sportfishing industry, striped bass remain a cornerstone of local economies from New England to the mid-Atlantic.

But the striped bass has not always been as plentiful as it once was.  Supply concerns have waxed and waned for more than a hundred years.  *See* Reiger, *The Striped Bass Chronicles* at 20, 31.  Unsurprisingly, States and the federal government alike have regulated striped bass fishing to preserve this iconic species.  Also unsurprisingly, not everyone agrees with those regulations.

This case arises from such a dispute.  Charter fishing boat companies want recreational fishermen to keep more fish than they are allowed.  So they filed this lawsuit to challenge the fishing limitations developed by the Atlantic States Marine Fisheries Commission—an interstate compact entity formed by fifteen States to coordinate fishery management.  Focusing mainly on the Chesapeake Bay, Plaintiffs say the current per-day catch limit is unnecessarily strict and harms the sportfishing industry and, indeed, entire bayside communities.  Plaintiffs also cast constitutional challenges to the broader regulatory structure governing fishery management.

But the Court need not tackle those questions today.  Defendants point to many flaws in Plaintiffs' Complaint.  Chief among those problems is Plaintiffs' failure to establish Article III standing to bring their claims.  State sovereign immunity also frustrates some claims.  The Court addresses only these jurisdictional flaws here and will dismiss the suit.

## I.

Because of stripers' migratory nature, "[n]o single government entity has full management authority" over them.  16 U.S.C. § 5151(a)(2).  The fish begin their lives in spawning waters, mainly in coastal sounds and estuaries like the Chesapeake Bay.  Atl. States Marine Fisheries Comm'n Mot. to Dismiss ("Comm'n Mot.") at 12, ECF No. 49-1.  At maturity, they join migratory populations in the ocean, returning to their natal waters only to spawn.  *Id.*

Oblivious to regulatory divisions, the fish migrate between waters controlled by States and those controlled by the federal government. *See United States v. Saunders*, 828 F.3d 198, 202 (4th Cir. 2016). In rivers and estuaries, state law governs. *New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d 524, 527 (2d Cir. 2010). The States also control fish within their "territorial sea"—ocean water within three nautical miles of shore. *Id.*; *see* 16 U.S.C. § 1856(a)(2). Beyond that three-mile zone, the federal government takes over. *New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d at 527 (citing 16 U.S.C. §§ 1801(b)(1), 1856(a), 5102(6)).

Striped bass fishing has been prohibited in federal waters for decades, 16 C.F.R. § 697.7(b), but the pastime continues in state waters. Plaintiffs challenge striped bass regulation in state waters. To understand the dispute some background on fishery management in state waters is helpful.

## A.

The Atlantic seaboard States have coordinated marine management decisions for decades. *See New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d at 527–28. Declining striper populations first motivated that cooperation. Russell, *Striper Wars* at 17. In 1942, a congressionally approved interstate compact created the Atlantic States Marine Fisheries Commission ("the Commission"). Pub. L. No. 77-539, 56 Stat. 267 (1942), amended by Pub. L. No. 81-721, 64 Stat. 467 (1950); Compl. ¶ 22, ECF No. 1. That Compact has been ratified by 15 States—the fourteen that front the Atlantic Ocean, plus Pennsylvania—and the District of Columbia. *New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d at 528 n.3.

The Commission does not directly regulate fishing. *See Delmarva Fisheries Ass'n, Inc. v. Atl. States Marine Comm'n*, 127 F.4th 509, 511 (4th Cir. 2025). Instead, the signatory States

use the Commission to "exercise joint regulatory authority of their fisheries through the development of interstate fishery management plans." *New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d at 528. Species-specific boards within the Commission produce the plans. Comm'n Mot. at 10. Representatives from affected States, along with other entities that manage fish in other jurisdictions—including federal agencies—sit on those boards. *Id.* at 10–11 (citing Atlantic States Marine Commission, Interstate Fisheries Management Program Charter, § 4 (rev. Aug. 2019)). States then implement the plan recommendations by enacting and enforcing regulations governing fishing in their waters. *Id.* at 10.

In 1981, the Commission issued its first striped bass plan. *Saunders*, 828 F.3d at 203. Concerned about declining striped bass numbers, that plan recommended several measures. *Id.* At the time, though, the plans were advisory. *New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d at 528; *see* Compl. ¶ 22. Signatory States made the ultimate call about how to regulate striped bass and they were not required to follow plan recommendations as a condition of Commission participation. *New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d at 528. With the "spotty" implementation of management measures came a drop in stripers. *Id.* (citation omitted); *see* Comm'n Mot. at 13.

That drew Congress's attention. Recognizing that "Atlantic striped bass are of historic commercial and recreational importance" and that the lack of a coordinated fishery management strategy had harmed stocks, Congress stepped in "to provide for effective interjurisdictional conservation and management of" the species. 16 U.S.C. § 5151(a). The 1984 Atlantic Striped Bass Conservation Act ("Bass Act"), Pub. L. No. 98-613, 98 Stat. 3187 (codified at 16 U.S.C. §§ 5151, *et seq.*), and 1993 Atlantic Coastal Fisheries Cooperative Management Act ("Atlantic Coastal Act"), Pub. L. No. 103-206 §§ 801–811, 107 Stat. 2419, 2447–54 (codified at 16 U.S.C.

§§ 5101–5108), created a federal enforcement mechanism for the Commission's plans.  If a State

fails to implement or effectively enforce plan-recommended measures, the Secretary of

Commerce can shut down all fishing for the affected species in that State's waters.  16 U.S.C.

§ 5106(c)–(h).  The result is that the Commission's fishery management plans set a "floor" for

the regulatory measures signatory States must implement.  Pls.' Mot. for Prelim. Inj. ("Pls.'

Mot.") at 15, ECF No. 19-1.  States do, however, retain ultimate responsibility for promulgating

and enforcing regulations within their waters.  *See, e.g.*, 16 U.S.C. § 5104(b)(1).  And nothing

prohibits a State from enforcing stricter regulations than those required by a plan.  Atlantic States

Marine Fisheries Commission Compact ("Compact"), art. IX, https://perma.cc/VME2-JMTA.[1]

What if a State is dissatisfied with a fishery management plan?  States can appeal the

species board's decision to the full Commission or challenge plan amendments in court.  *New

York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d at 536.  And a signatory can always

withdraw from the Commission altogether for any reason with six months' notice.  Compact, art.

XII; *Delmarva Fisheries*, 127 F.4th at 511.

The coordinated effort ushered in by the Bass Act and the Atlantic Coastal Act solved the

tragedy of this watery commons.  States implemented the Commission's recommended

measures—like minimum size limits for keeping a fish.  *Delmarva Fisheries*, 127 F.4th at 511.

Some States went further, forbidding all striped bass fishing.  *Id.*  By 1995, coastal and

Chesapeake Bay striped bass stocks were restored.  *Id.* at 511–12.  But that is not the end of the

---

[1]  The Bass Act and Atlantic Coastal Act also strengthened federal-State cooperation.  The
Secretary of Commerce must regulate fishing in federal waters in a way that is "compatible"
with the Commission's fishery management plans.  16 U.S.C. § 5158(a)(2); *see id.* § 5158(b)
(directing the Secretary to consult the Commission as necessary).

story.  The Striped Bass Board has amended its original plan several times to keep pace with changing pressures on striper populations.

In 2024, the Board approved the most recent plan modification, known as "Addendum II."  Addendum II to Amendment 7 to the Atlantic Striped Bass Interstate Fishery Management Plan for Atlantic Sea Bass ("Addendum II"), ECF No. 36-4.  That addendum made several changes to the existing plan, including reducing commercial fishing quotas and altering the size requirements for keeping a fish.  *Id.* §§ 3.1.1, 3.2.2.  Addendum II also included a one-fish-per-day-per-recreational-fisher limit.  *Id.* § 3.1.1.  States had to enact their own implementing regulations by May 2024.  *Id.* § 4.0.

They did so.  *See* Maryland et al. Mot. to Dismiss at 14 ("Maryland Mot."), ECF No. 45-1.  In fact, many States' existing regulations already satisfied Addendum II.  For example, every signatory State with striped bass except Maryland already had a one-fish-per-day recreational limit.  *See id.* at 14, 26; *Delmarva Fisheries Ass'n*, 127 F.4th at 512.  And in Maryland's case, a limited pilot program was the only exception to the one-fish-per-day rule.  Maryland Mot. at 26 n.6; Hr'g Tr. 30:21–31:17.  More, States have since imposed stricter regulations than required by Addendum II.  *See, e.g.*, Maryland Mot. at 39 (describing Maryland's cancellation of the "trophy season"); Hr'g Tr. 21:11–13, 22:5–6 (Plaintiffs' acknowledgment that "Maryland went even higher" as was "their prerogative"); Hr'g Tr. 33:2–7 (discussing Maryland's support for future "more restrictive measures for the recreational catch of striped bass").

**B.**

Non-profit associations representing the fishing industry challenge Addendum II and the Commission more broadly.  Compl. ¶ 1.  Two Plaintiffs—the Delmarva Fisheries Association, Inc. ("Delmarva") and the Maryland Charter Boat Association ("Maryland Charter")—represent

the Chesapeake Bay charter fishing industry.  Compl. ¶¶ 7, 8.  Addendum II's limits, they say, curbed demand for charter boat rentals by limiting the number of fish recreational fishers can bag.  *See* Compl. ¶¶ 31–32.

Delmarva and Maryland Charter first challenged Addendum II last year in the District of Maryland.  *See Delmarva Fisheries Ass'n, Inc. v. Atl. States Marine Fisheries Comm'n*, No. RDB-24-0688, 2024 WL 1721066 (D. Md. Apr. 22, 2024), *vacated and remanded*, 127 F.4th 509 (4th Cir. 2025).  That lawsuit named only the Commission as a defendant.  *Id.* at *2. Delmarva and Maryland Charter said that the Commission had deprived their members of due process and violated 42 U.S.C. § 1983 and Article 19 of the Maryland Constitution.  *Id.*  The court denied Delmarva and Maryland Charter's motion for a preliminary injunction.  *Id.* at *3.

On appeal, the Fourth Circuit went even further.  It threw out the case for failure to satisfy Article III's redressability requirement.  *Delmarva Fisheries*, 127 F.4th at 516.  The Fourth Circuit explained that Delmarva and Maryland Charter "are regulated by Maryland, not the Commission," but had not challenged Maryland's regulations.  *Id.* at 515.  Nor had they "plausibly alleged that Maryland is likely to repeal its striped-bass regulations if Addendum II were to be enjoined."  *Id.* at 516.  The Court thus remanded the case for dismissal.  *Id.*

Fresh off that defeat, Delmarva and Maryland Charter filed this lawsuit.  *See* Compl., ECF No. 1.  This time, they added more Plaintiffs:  Cape Cod Charter Boat Association, the Connecticut Charter & Party Boat Association, and the Montauk Boatmen & Captains Association.  Compl. ¶¶ 5, 6, 9.  These Plaintiffs represent similar constituencies to Delmarva and Maryland Charter outside the Chesapeake.  Compl. ¶¶ 5, 6, 9.  Plaintiffs describe themselves as associations that "promote sportfishing, sightseeing and cruising throughout the Atlantic coast," and claim that Addendum II harms their members.  Compl. ¶¶ 1, 2.

Besides the Commission, Plaintiffs sued 41 new Defendants.  That includes state officials and agencies responsible for enforcing fishing regulations in the fifteen Compact-signatory States.  Compl. ¶ 15.  Non-state entities that sit on the Striped Bass Board—including representatives of the District of Columbia and the Potomac River Fisheries Commission (an interstate compact between Maryland and Virginia)—were also named as Defendants.  Compl. ¶¶ 16, 17.  As were several federal actors with fish regulatory authority.  Compl. ¶¶ 11–13.

Plaintiffs brought five claims for relief.  Their first two claims challenge the Commission's structure.  They allege that the Commission violates the Tenth Amendment's anticommandeering principle and the Interstate Compacts Clause.  Compl. ¶¶ 56–60, 61–66.  Plaintiffs also allege a Fifth Amendment taking of unspecified property and a claim under 42 U.S.C. § 1983.  Compl. ¶¶ 67–70, 71–74.  The final claim alleges a violation of the Maryland Constitution.  Compl. ¶¶ 75–78.  Plaintiffs seek "[a]n interim order and permanent judgment holding unlawful, enjoining, and setting aside in full [Addendum II.]"  Compl. at 27.

Four months after filing their Complaint, and after the federal Defendants moved to dismiss the Complaint, Plaintiffs sought a preliminary injunction.  Pls.' Mot., ECF No. 19-1.  Plaintiffs simultaneously moved to substitute several state entities and officers as Defendants for improperly identified state entities and officers.  Pl.'s Mot. to Add & Drop Parties, ECF No. 20.  The Court allowed the substitution and set a briefing schedule.  Defendants opposed Plaintiffs' motion for a preliminary injunction and moved to dismiss the Complaint.  Federal Defs.' Mot. to Dismiss, ECF No. 18; Georgia Dep't of Nat. Resources et al. Mot. to Dismiss ("Georgia Mot."), ECF No. 36; Florida Mot. to Dismiss, ECF No. 44; Maryland Mot., ECF No. 45; Comm'n Mot., ECF No. 49; Potomac River Fisheries Commission Mot. to Dismiss ("Potomac River Mot."),

ECF No. 50.[2]  Those motions are now ripe.  The Court focuses here on the motions to dismiss, which it will grant.

## II.

To survive a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden of proving that the Court has subject matter jurisdiction to hear his claims.  *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).  Federal district courts possess limited jurisdiction, and it is "presumed that a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Thus, the plaintiff "bear[s] the burden of establishing jurisdiction by a preponderance of the evidence."  *Yaghoubnezhad v. Stufft*, 734 F. Supp. 3d 87, 95 (D.D.C. 2024).

When evaluating a motion to dismiss under Rule 12(b)(1), the Court must "treat the Complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (cleaned up).  But those factual allegations "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Schilling v. Speaker of U.S. House of Reps.*, 633 F. Supp. 3d 272, 274–75 (D.D.C. 2022), *aff'd sub nom. Schilling v. U.S. House of Reps.*, 102 F.4th 503 (D.C. Cir. 2024).  And a court may consider documents outside the pleadings to evaluate whether it has jurisdiction.  *See Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  If the Court determines that it lacks jurisdiction, it must dismiss the claim or action. Fed. R. Civ. P. 12(b)(1), 12(h)(3).

---

[2]  All but two Defendants joined one of these motions.  The only Defendants who have not yet appeared are Cheri Patterson, in her official capacity as Administrator of New Hampshire Fish and Game Department, and the New Hampshire Fish and Game Department.  Because the redressability defect identified below applies equally to all Defendants, the Court will dismiss the Complaint in its entirety—including against the New Hampshire Defendants.

# III.

The Court begins with the jurisdictional question of standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Federal courts "do not possess a roving commission to publicly opine on every legal question" and do not "exercise general legal oversight" of private parties or the other branches of the federal government. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021). Standing doctrine focuses courts on "matters of a Judiciary Nature," by ensuring that the proper plaintiff sued the proper defendant over an injury a court can remedy. *Id.* at 424 (cleaned up).

To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* at 423. At the pleading stage, a plaintiff must "clearly allege . . . facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up). And he must do so for each defendant and for each form of relief sought. *See Davis v. FEC*, 554 U.S. 724, 734 (2008).

Because Plaintiffs here claim injury to their members, not themselves, Compl ¶ 1, they must also satisfy three more requirements. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).[3] The third requirement is prudential. *Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024).

---

[3] Academics and jurists have questioned the basis for associational standing. *See, e.g.*, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 397–405 (2024) (Thomas, J., concurring); *Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1167–70 (D.C. Cir. 2025) (Henderson, J.,

Applying these requirements here, Plaintiffs lack standing for all their claims.  That may seem remarkable.  Fishing industry members *should* be able to allege facts establishing standing to challenge fishing regulations.  But Plaintiffs supply no detailed allegations about how their members' injuries would change if the Court granted the relief Plaintiffs seek.  Plaintiffs rather ask the Court to exercise a roving law-review power.  That will not do.  Article III's standing requirements implement "the Framers' concept of the proper—and properly limited—role of the courts in a democratic society."  John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 Duke L. J. 1219, 1220 (1993) (cleaned up).  Because Plaintiffs have not alleged facts establishing their standing, and redressability in particular, the Court must dismiss the case.

### A.

Start with Article III's injury requirement.  Plaintiffs must show a "concrete, particularized, and actual or imminent" injury.  *TransUnion*, 594 U.S. at 423.  Because Plaintiffs are associations standing in their members' shoes, they must plausibly allege that at least one member has an injury-in-fact.  *Hunt*, 432 U.S. at 342–43.  And because they seek injunctive relief, Plaintiffs must show that their members are "suffering an ongoing injury or face[] an immediate threat of injury."  *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011).  Plaintiffs do not plausibly allege injury to the wide swath of the New England and Mid-Atlantic fishing industry they represent.  Only the Maryland Plaintiffs have plausibly alleged ongoing injury to their members.

Each Plaintiff alleges that "[m]any of its members conduct fishing operations" and "are adversely affected by the conduct of [the Commission] and other Defendants in this case."

---

concurring); Michael T. Morely & F. Andrew Hessick, *Against Associational Standing*, 91 U. Chi. L. Rev. 1539, 1588–91 (2024).  But precedent requires its application here.

Compl. ¶¶ 6–9. That conclusory recitation does not cut it, even at the motion-to-dismiss stage. *Kareem v. Haspel*, 986 F.3d 859, 865–66 (D.C. Cir. 2021). "Each element of standing must be supported in the same way as any other matter on which plaintiff bears the burden of proof." *Id.* at 865 (quoting *Lujan*, 504 U.S. at 561). At the pleading stage, the Complaint must "contain sufficient factual matter, accepted as true, to state a claim of standing that is plausible on its face." *Id.* (cleaned up).

Plaintiffs' allegations that meet this standard establish injury only to Maryland fishermen in the Chesapeake Bay. That is because the Complaint's details about economic harm exclusively address Maryland fishermen. *See, e.g.*, Compl. ¶ 38 (alleging that Addendum II "forced over 50" Maryland Charter members to close); Compl. ¶ 53 (repeating this figure); Compl. ¶ 32 (alleging that Addendum II "caused a decline of up to 75 percent in fishing revenue to the members of DFA and MBCA"). More, Plaintiffs submitted eight letters discussing the importance of recreational bass fishing in the Chesapeake region and how the one-fish limit harms that industry. Pls.' Ex A ("Hardman Decl.") at 2–3, ECF No. 1-2; Pls.' Ex. B at 2, ECF No. 1-3 (letter from a bait shop owner); Pls' Ex. C at 2, ECF No. 1-4 (letter from a restaurant server); Pls.' Ex. D at 2–5, ECF No. 1-5 (letters from Maryland counties).

Plaintiffs also supply two letters from non-Plaintiff fishing associations purporting to address Addendum II's effects outside Maryland, but these letters do not show plausible injury to the non-Maryland Plaintiffs. One letter repeats Plaintiffs' allegations of unspecified "economic harm" to boat companies on the East Coast. Pls.' Ex. E at 3, ECF No. 1-6. The other letter, from an organization in North Carolina, does not even claim that Addendum II harms its members. *Id.* at 2. If anything, that letter suggests that Addendum II's effects are localized because it speaks only to striped bass' importance in the Chesapeake region. *Id.*

More, Maryland Charter is the only Plaintiff that plausibly alleges at least one of its members has standing in its own right. *Hunt*, 432 U.S. at 342–43. Again, the Complaint contains no specific allegations about harm to the non-Maryland Plaintiffs, let alone to their members. Maryland Charter, meanwhile, identifies an injured named member. Maryland Charter's president reports that his company, Lead Dog Charters, LLC, saw a 75% decline in bookings during the 2024 season. Hardman Decl. ¶¶ 1–2, 6. And he claims Addendum II is to blame. *Id.* ¶ 7. Defendants say that even this cannot establish injury because it does not speak to the 2025 season (or beyond). Maryland Mot. at 24–25. But the same declaration also reports that "sign-ups for the 2025 fishing season continue to be minimal compared to the same time period in 2023 and will likely decline even further." Hardman Decl. ¶ 10. At the motion-to-dismiss stage, that is enough.[4]

Because only Maryland Charter has plausibly alleged injury to its members, all of Plaintiffs' claims must be tethered to that injury. That only one Plaintiff has sufficiently alleged an injury-in-fact would not matter if Plaintiffs' claims overlapped entirely. One injured plaintiff satisfies Article III for all claims arising from that injury. *See Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011). But aside from Delmarva, the other Plaintiffs' members fish in different waters, controlled by different States. *See* Compl. ¶¶ 5–7. And because Maryland Charter's members fish only in Maryland's waters, the only relevant regulations are ones that

---

[4] Whether a plaintiff-association must identify an injured member *by name* at the motion-to-dismiss stage is an unsettled question. *See Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of Am. v. USDA*, 573 F. Supp. 3d 324, 334 (D.D.C. 2021) (collecting cases); *see also Coal. for Humane Immigrant Rights v. U.S. Dep't of Homeland Sec.*, 780 F. Supp. 3d 79, 91–92 (D.D.C. 2025) (denying a preliminary injunction motion for lack of associational standing based on pseudonymous hearsay claims of harm to members). The Court need not wade into that dispute here. As explained above, Maryland Charter satisfies even the more demanding requirement, while the non-Maryland Plaintiffs do not even plausibly allege injury to unnamed members.

apply in Maryland waters.  Hr'g Tr. 13:3–7.  All of this means that injury alone bars the non-Maryland Plaintiffs from establishing standing.

## B.

Consider next redressability—a hurdle no Plaintiff clears.  This requirement asks a "simple question:  If plaintiffs secured the relief they sought, would it redress [at least some of] their injury?"  *Seed v. EPA*, 100 F.4th 257, 263 (D.C. Cir. 2024) (cleaned up); *see Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) ("[T]he ability to effectuate a partial remedy satisfies the redressability requirement.") (cleaned up).  The only form of relief Plaintiffs seek (aside from costs and fees) is an injunction against Addendum II's enforcement.  Compl. at 27.  Plaintiffs must show that this relief "would likely redress at least some" of their injuries.  *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2135 (2025).  Plaintiffs have not "clearly allege[d] facts demonstrating" that the relief they seek would likely change *anything* for their members.  *Spoeko*, 578 U.S. at 338 (cleaned up).[5]

Charitably read, the Complaint at most alleges that Addendum II harms Maryland fishermen.  *See* Hardman Decl. ¶ 7 (alleging that the charter boat revenue decline was "due to the

---

[5]  At times, Plaintiffs appear to contemplate broader relief, though it is unclear what that would be.  *See, e.g.*, Compl. ¶ 60 (Plaintiffs' anticommandeering claim "support[s] invaliding the entire ASMFC as it is currently constituted"); Compl. ¶ 66 (Plaintiffs' Interstate Compacts Clause claim "support[s] the invalidation of all post-1984 regulatory actions of the ASMFC"); Mot. for Prelim. Inj. at 11 (this lawsuit seeks to vindicate "sovereign powers reserved exclusively to the states under the Tenth Amendment"); Pls.' Reply for Prelim. Inj. ("Pls.' Reply") at 26, ECF No. 52 (this lawsuit seeks "the return of the unconstitutionally delegated authority to the federal government").  These gestures to other relief do not satisfy Plaintiffs' burden of identifying a remedy that would likely redress their injuries.  *See Beehive Tel. Co. v. FCC*, 179 F.3d 941, 945 (D.C. Cir. 1999) (holding that plaintiff lacked standing because it sought "no remedy that could redress its claimed injuries"); *Huron v. Cobert*, 809 F.3d 1274, 1279 (D.C. Cir. 2016) (explaining that a plaintiff "bear[s] the burden of establishing each of [the] elements of standing").  In any event, other relief targeting the Commission would face the same problem as an injunction against Addendum II's enforcement.  Plaintiffs do not allege that any State would likely change its laws without the Commission.

ASMFC Addendum II"); Compl. ¶ 38 (similar).  It does not allege what would happen without Addendum II, much less that enjoining Addendum II would redress the only injuries that Plaintiffs plausibly allege—those resulting from Maryland's one-fish limit.  *See supra* Part III.A. Although causation and redressability often overlap, that is not always the case.  *See, e.g.*, *Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1278 (D.C. Cir. 2007). When "the challenged conduct is at best an indirect or contributing cause of the plaintiff's injury, . . . the plaintiff faces an uphill climb in pleading and proving redressability." *Johnson v. Becerra*, 111 F.4th 1237, 1245 (D.C. Cir. 2024) (cleaned up).

That is the case here because Plaintiffs "are regulated by Maryland, not the Commission." *Delmarva Fisheries Ass'n*, 127 F.4th at 515.  Recall that neither Addendum II nor any other Commission-produced plan directly regulates fishermen.  *See supra* Part I.A. Instead, the Commission identifies minimum conservation measures that signatory States then operationalize by implementing and enforcing their own regulations.  *See supra* Part I.A; Hr'g Tr. 11:9–13 (Plaintiffs' agreement that boats are "cited by local authorities for violation of state law").  Maryland's regulations are the relevant ones here because the only Plaintiffs with standing fish in that State's waters.  *See supra* Part III.A; Hr'g Tr. 11:5–8 (Maryland Charter's members fish in Maryland waters).  The gist of Plaintiffs' argument is that Maryland would not have enacted those regulations without Addendum II.  *See* Compl. ¶¶ 34, 56–60.  Even assuming Plaintiffs are right about that, *see Tanner-Brown*, 105 F.4th at 445, they have not shown redressability.

Because Maryland enacts the restrictions through its own regulatory process, the laws would persist without Addendum II.  *See* Hr'g Tr. 48:24–49:20.  More, everyone agrees that Maryland has not only implemented Addendum II's requirements; it has gone beyond the

regulatory floor Addendum II sets. *See, e.g.*, Hr'g Tr. 21:8–13; Maryland Mot. at 28. But Plaintiffs have not challenged those regulations. Hr'g Tr. 15:6–12 (Plaintiffs' representation that they have not "per se" challenged state regulations); *see* Compl. at 27 (asking for an injunction "setting aside in full the ASMFC 2024 Striped Bass Addendum"). And a court cannot redress an injury when an unchallenged law would continue to inflict the same harm on Plaintiffs without the challenged one. *See, e.g.*, *Delta Const. Co. v. EPA*, 783 F.3d 1291, 1296–97 (D.C. Cir. 2015); *West v. Lynch*, 845 F.3d 1228, 1236–37 (D.C. Cir. 2017). So Plaintiffs must plausibly allege that enjoining Addendum II "will change how Maryland regulates them." *Delmarva Fisheries Ass'n*, 127 F.4th at 515.

The D.C. Circuit's decision in *West* is instructive. There, a Washington citizen unhappy with the State's legalization of recreational marijuana asked the court to "void" a memorandum that advised federal prosecutors they should generally respect state laws permitting marijuana, despite the Controlled Substance Act's marijuana prohibition. *See West*, 845 F.3d at 1230–31. The plaintiff claimed that the memorandum unconstitutionally commandeered state legislators, apparently on the theory that Washington could permit recreational marijuana only because federal officials were not enforcing the Controlled Substance Act. *Id.* The Circuit held that it lacked jurisdiction. The plaintiff merely speculated that without the memorandum, Washington would "crack[] down on the use of recreational marijuana." *Id.* at 1236. "When conjecture is necessary," the court explained, "redressability is lacking." *Id.* at 1237.

This case presents the same problem, as the Fourth Circuit recognized in Delmarva and Maryland Charter's last lawsuit.[6] While it may be "theoretically possible" that Maryland would

---

[6] The Fourth Circuit's decision is not only persuasive, but also preclusive as to Delmarva and Maryland Charter's standing to re-raise any claims from the Maryland lawsuit against the Commission. "Because a jurisdictional dismissal does not involve an adjudication on the merits,

change its regulations if Addendum II was unenforceable, *Delta Constr. Co.*, 783 F.3d at 1297, Plaintiffs have not plausibly alleged that is a likely outcome, *see Delmarva Fisheries Ass'n*, 127 F.4th at 516. Plaintiffs name Maryland Defendants this time, *see* Compl. ¶ 15, but they do not allege that Maryland would change its regulations. In fact, when asked about whether Maryland would likely change its regulations, Plaintiffs refused to even speculate about how States would respond. *See* Hr'g Tr. 22:5–12 (describing the State's decision to adopt stricter restrictions than required by Addendum II as "a separate issue"); Hr'g Tr. 23:2–5 (responding to the Court's question about States' ability to leave the Compact as "a counterfactual situation").

That hesitancy betrays Plaintiffs' confusion about the nature of their claims and the relief they seek. Plaintiffs' Complaint proceeds on the theory that the Commission has become "a full-fledged" federal regulator that commandeers States into regulating striped bass within *state* waters. Compl. ¶¶ 28, 56–60. But in briefing and at argument, Plaintiffs inexplicably focus on laws governing fishing in *federal* waters. *See, e.g.*, Pls.' Reply for Prelim. Inj. ("Pls.' Reply") at 8, 19, ECF No. 52; Hr'g Tr. 25:19–26:13. More, they cannot decide whether the result of enjoining Addendum II would be to return power to the States or to return power to the federal government. *Compare, e.g.*, Pls.' Mot. at 11 (this lawsuit seeks to vindicate "sovereign powers reserved exclusively to the states under the Tenth Amendment") *with* Pls.' Reply at 26 (this

---

it will not bar relitigation of the cause of action originally asserted, but it may preclude . . . relitigation of the precise issues of jurisdiction adjudicated." *Nat'l Ass'n of Home Builders v. EPA*, 786 F.3d 34, 41 (D.C. Cir. 2015) (cleaned up). Delmarva and Maryland Charter repeat their 42 U.S.C. § 1983 and constitutional due process claims against the Commission, without curing the redressability defect the Fourth Circuit identified. *See* Compl. ¶¶ 71–74. Plaintiffs resist preclusion, arguing that their new Tenth Amendment claim is "a material change following dismissal [that] cured the original jurisdictional deficiency." *Nat'l Ass'n of Home Builders*, 786 F.3d at 41; *see* Pls.' Reply at 41. But "a plaintiff must demonstrate standing for each claim he seeks to press." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017). So a new claim cannot cure the standing defects of old ones. And as discussed above, the Tenth Amendment claim suffers from the same redressability flaw as the others.

lawsuit seeks "the return of the unconstitutionally delegated authority to the federal government"). This bait-and-switch reinforces the redressability problem. It suggests that Plaintiffs know that they do not like the status quo, but they cannot explain why enjoining Addendum II is the solution.

Meanwhile, from what the Court can tell, nothing would likely change for Plaintiffs' members without Addendum II. Maryland—along with eleven other States and the District— says that it would not likely rescind its regulations. Maryland Mot. at 28; Hr'g Tr. 32:6–33:12; *cf. Diamond Alt. Energy*, 145 S. Ct. at 2137–38 (looking at government defendants' representations as part of the redressability analysis). Recall that Maryland demonstrated commitment to the regulations by enacting stricter restrictions than Addendum II requires. *See* Maryland Mot. at 28, 38–39. All of this suggests that even if Addendum II originally caused Plaintiffs' harm, "the undoing of [that action] will not undo the harm, because the new status quo is held in place by other forces"—Maryland's belief that the restrictions are beneficial. *Renal Physicians Ass'n*, 489 F.3d at 1278. Once again, Plaintiffs have failed to establish redressability because they do not "plausibly allege that Maryland would opt to *rescind* its duly enacted regulations if Addendum II were enjoined." *Delmarva Fisheries*, 127 F.4th at 516.

Plaintiffs' three responses to the redressability problem do not hold water. First, Plaintiffs say that redressability should be straightforward because they allege the Commission is acting unconstitutionally and "federal courts can enjoin unconstitutional action." Pls.' Reply at 16. But "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1159 (D.C. Cir. 2025) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998)). So Plaintiffs must show that they have standing to

seek this particular injunction.

Second, Plaintiffs argue that because they now claim the Commission's structure violates the Tenth Amendment, they only need to show "inflicted harm from an unconstitutional source." Pls.' Reply at 34, 36–38. That is incorrect. *Bond v. United States*, 564 U.S. 211 (2011), teaches that Article III standing applies normally to federalism-based claims. *Bond* held that a criminal defendant could challenge the federal statute under which she was indicted as an intrusion "upon the sovereignty and authority of the States." 564 U.S. at 214. Because federalism protects individual liberty as well as State sovereignty, the Court explained, an individual could "in a proper case, challenge a law as enacted in contravention of constitutional principles of federalism." *Id.* at 223–24. The "proper case" language, along with the Court's analysis of Bond's Article III standing, made clear that standing doctrine applies normally to Tenth Amendment claims. *Id.* at 217, 221–22; *see LaRoque v. Holder*, 650 F.3d 777, 792 (D.C. Cir. 2011) ("Of course, a litigant is in no way free from familiar constitutional . . . standing requirements merely because he challenges a law that he claims upsets the constitutional balance between the National Government and the States") (cleaned up); *Carik v. Dep't of Health & Hum. Servs.*, 4 F. Supp. 3d 41, 57 (D.D.C. 2013) ("[U]nder *Bond*, the individual alleging a Tenth Amendment claim must independently have Article III standing").

Although courts have suggested that the causation and redressability showing can be relaxed for other constitutional defects, Plaintiffs have not shown that the same should be true here. *See Waterkeeper All., Inc. v. Regan*, 41 F.4th 654, 660 (D.C. Cir. 2022) ("Plaintiffs bear the burden to establish the elements of standing."). In *Seila Law LLC v. CFPB*, for example, the Supreme Court explained "[i]n the specific context of the President's removal power, we have found it sufficient that the challenger sustains injury from an executive act that allegedly exceeds

the official's authority." 591 U.S. 197, 211 (2020) (cleaned up); *see* Pls.' Reply at 17 (citing *Seila*). And lower courts have permitted a similarly relaxed showing for Appointments Clause claims. Pls.' Reply at 36–38 (citing *Lofstad v. Raimondo*, 117 F.4th 493 (3d Cir. 2024) and *New England Fishermen's Stewardship Ass'n v. Raimondo*, 761 F. Supp. 3d 141 (D. Me. 2024)). But Plaintiffs do not allege that sort of constitutional defect. Their constitutional concern is federalism-based. *See* Compl. ¶¶ 56–60 (anticommandeering claim); Hr'g Tr. 14:3–16 (Plaintiffs' description of their anticommandeering claim as "the core of our case"). And Plaintiffs do not explain how these cases overcome *Bond*'s teaching that an individual must have Article III standing to raise a Tenth Amendment claim. 564 U.S. at 222. Of course, the allegedly commandeered States are defending the status quo, not challenging federal encroachment on their prerogatives.

Third, Plaintiffs purport to factually challenge Maryland's representations that it would not rescind the regulations. Pls.' Reply at 36. They point to a letter from the Maryland Attorney General's Office as evidence that the "coercive power of the federal government" keeps the State's regulations in place. *Id.*; *see* Compl. ¶ 34; Pls.' Ex. F at 2 ("Att'y Gen. Letter"), ECF No. 1-7. Plaintiffs misrepresent that evidence. The language they rely on comes from the Attorney General's response to their request that Maryland challenge Addendum II. *See* Maryland et al. Reply at 10, ECF No. 78; Ex. B to Maryland et al. Reply at 1–2, ECF No. 78-3 (Plaintiffs' letter). Maryland declined to do so. Att'y Gen. Letter at 2. The response letter acknowledged that Maryland *could* sue the Commission to "prevent enforcement of the Addendum" but had "elected not to do so." *Id.* The Office explained that staying the regulations would not be "in the State's best interest." *Id.* Finally, in the passage Plaintiffs highlight, the letter warns Plaintiffs that a stay of Maryland's regulations could have consequences, including a moratorium on all

striped bass fishing.  *Id.*

The letter does not undermine the State's representations here.  It reinforces Maryland's disapproval of Plaintiffs' lawsuit and commitment to striped bass regulation.  If the State changed its mind, it could change its regulations and avoid a moratorium by withdrawing from the Commission.  *Delmarva Fisheries Ass'n*, 127 F.4th at 515; Hr'g Tr. 71:25–72:6.  And the Attorney General does not have the final say over that decision.

* * *

In short, the redressability problem the Fourth Circuit identified remains.  Because enjoining Addendum II would likely "have no impact" on Plaintiffs' injuries, they lack standing.  *Ctr. for Biological Diversity*, 146 F.4th at 1159.  So the Court lacks jurisdiction over their claims.  *See Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) ("[T]he defect of standing is a defect in subject matter jurisdiction").

## IV.

Sovereign immunity also independently prevents the Court from considering some of Plaintiffs' claims.

The Eleventh Amendment generally withdraws federal jurisdiction over claims against a State.  U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.").  State sovereign immunity applies more broadly than the text of the Eleventh Amendment suggests.  *See Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("Although by its terms the Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suits by citizens against their own States.").  Whether

immunity applies turns on whether "a particular suit in fact is a suit against a State." *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). If so, a federal court lacks jurisdiction unless the State waives immunity or Congress has abrogated it.

Start with the fifteen state-agency Defendants. A suit against state "agencies or departments" is considered a suit against the State. *Pennhurst*, 465 U.S. at 100. The agencies do not consent to suit, and Congress has not abrogated their immunity. Maryland Mot. at 19–20; Georgia Mot. at 27–28. Plaintiffs' only response is that "federal courts have jurisdiction over 'Cases' and 'Controversies' under federal law." Pls.' Reply at 40. But "[s]tate sovereign immunity bars actions in federal court regardless of the basis for otherwise appropriate subject matter jurisdiction." *Montin v. Moore*, 846 F.3d 289, 293 (8th Cir. 2017); *see Hans v. Louisiana*, 134 U.S. 1, 10–19 (1890) (holding that federal courts lack jurisdiction over a suit arising under federal law against a State by a citizen of that State). So Plaintiffs' claims against these Defendants must be dismissed.

Whether sovereign immunity bars Plaintiffs' claims against the state-officer Defendants is more complicated. Sovereign immunity does not apply to suits for prospective injunctive relief against a state officer in his official capacity. *See generally Ex parte Young*, 209 U.S. 123 (1908). Though Plaintiffs do not address the *Young* exception, they seem to rely on it by seeking prospective relief against state officers in their official capacity. *See* Compl. ¶ 15; *id.* at 27. Defendants counter that Plaintiffs' claims really run against the States themselves. Maryland Mot. at 21–22; *see* Compl. ¶ 15 (referring to "[t]he Defendant States"). Plaintiffs, Defendants point out, do not coherently allege that the state-officer Defendants are responsible for enforcing unconstitutional state laws. Maryland Mot. at 21–22.[7] Plaintiffs do not respond, thereby

---

[7] It is unclear whether Plaintiffs believe Addendum II is an unconstitutional *state* law. Their

forfeiting the argument.  As the D.C. Circuit has explained, "[a]lthough a party cannot forfeit a claim that we *lack* jurisdiction, it can forfeit a claim that we *possess* jurisdiction."  *Scenic Am., Inc. v. Dep't of Transp.*, 836 F.3d 42, 53 n.4 (D.C. Cir. 2016) (emphasis added); *see Brookens v. United States*, 981 F. Supp. 2d 55, 62 (D.D.C. 2013) (treating a plaintiff's failure to respond to a sovereign immunity argument as a concession that it applies).  More, at the very least, the Court cannot consider the Maryland-law claim against any state official.  Compl. ¶¶ 75–78.  State-law claims are not covered by the *Young* exception.  *Pennhurst*, 465 U.S. at 106.[8]

Finally, Plaintiffs have also forfeited the argument that the Court has subject matter jurisdiction over the claims against the Potomac River Fisheries Commission.  Potomac River moved to dismiss the claims against it, arguing that it is entitled to sovereign immunity as an interstate compact between Maryland and Virginia.  Potomac River Mot. at 18–22; *see Puerto Rico Ports Auth. v. Fed. Mar. Comm'n*, 531 F.3d 868, 873 (D.C. Cir. 2008) (listing three factors governing this inquiry).  Plaintiffs did not respond.  *See* Potomac River Fisheries Commission Reply at 23–24, ECF No. 82.  So this Court also lacks jurisdiction over these claims.  *See Scenic Am., Inc.*, 836 F.3d at 53 n.4; *Brookens*, 981 F. Supp. 2d at 62.

To sum it up, sovereign immunity independently deprives the Court of jurisdiction over the claims against the state Defendants and the Potomac River Fisheries Commission.

---

theory appears to be that the Commission exercises federal authority, and that Addendum II is unauthorized federal law.  *See* Compl. ¶¶ 28, 56–60.  But at argument, Plaintiffs' counsel revealed that they are trying to maintain their anticommandeering claim against the very States they say have been commandeered.  Hr'g Tr. 26:14–27:8.  It is unclear whether they believe the state officials are the ones responsible for commandeering the States and how that could be.

[8]  The D.C. Defendants are not entitled to sovereign immunity, as they acknowledge.  *See* Maryland Mot. at 19 n.4.

**V.**

In concluding that the case must be dismissed, the Court does not question the sincerity of Plaintiffs' concerns about the limitations on striped bass fishing. That American pastime remains important to countless sportfishermen and the businesses that serve them.

But importance alone is not a constitutional hook for a "Case" or "Controvers[y]." U.S. Const. art. III, § 2. Plaintiffs must plausibly allege that enjoining Addendum II "will likely alleviate the particularized injury alleged." *West*, 845 F.3d at 1235. Otherwise, the Court risks straying outside Article III's boundaries by opining on legal issues in response to citizens who might "roam the country in search of governmental wrongdoing." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). Plaintiffs would have the Court do just that. They focus on Addendum II, without giving any attention to the practical interaction between Addendum II and the state regulations implementing the policies they dislike. But the Court cannot blind itself to those practical realities bearing on its jurisdiction.

And standing is not the only problem. As explained, the Court lacks jurisdiction over the claims barred by sovereign immunity. Defendants raise a host of other flaws with the Complaint, but the Court need not consider those other issues here. Because the Court lacks subject matter jurisdiction over Plaintiffs' claims, it will dismiss the Complaint without prejudice. *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1253 (D.C. Cir. 2020) ("[A] dismissal for want of subject-matter jurisdiction can only be without prejudice."). Plaintiffs' motion for a preliminary injunction will be denied as moot. A separate Order will issue today.


Dated:  November 14, 2025                     _____
                                              TREVOR N. McFADDEN, U.S.D.J.